920 So.2d 174 (2006)
Carol CATALDO, as Personal Representative of the Estate of Carl Cataldo, deceased, Appellant,
v.
LAZY DAYS R.V. CENTER, INC., a Florida corporation, and Beaver Coaches, Inc., a foreign corporation, Appellees.
No. 2D04-3904.
District Court of Appeal of Florida, Second District.
February 10, 2006.
Joel D. Eaton, Miami, and Wagner, Vaughn & McLaughlin, P.A., Tampa, for Appellant.
Tracy Raffles Gunn of Fowler White Boggs Banker, P.A., Tampa, for Appellee.
*175 CASANUEVA, Judge.
This appeal presents an issue of first impression in this court: whether a seller of a used and reconditioned motor home can be sued in strict liability under section 402A of the Restatement (Second) of Torts on the ground that it is defective and unreasonably dangerous. We decline to extend strict liability to those who do business in used motor vehicles. The supreme court, however, can exercise its common-law power to adopt such a doctrine to ensure statewide uniformity of law, as in West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla.1976). Therefore, we certify the following question of great public importance, which we answer in the negative:
CAN A FLORIDA COURT IMPOSE STRICT LIABILITY ON THE SELLER OF A USED AND RECONDITIONED MOTOR VEHICLE THAT IS DEFECTIVELY DESIGNED AND UNREASONABLY DANGEROUS?

Facts of this Case
Lazy Days R.V. Center, Inc., sells new and used recreational vehicles and motor homes. Advertising itself as the "world's largest" R.V. dealer, the company deals in nineteen different product lines. Although a number of factory representatives are located on the premises, the manufacturer of the vehicle at issue apparently did not have an on-site representative at the time of sale.
On April 2, 2000, Carl Cataldo and his wife, Carol, purchased a used 1988 motor home from Lazy Days for over $50,000. Beaver Coaches, Inc., which designed and manufactured the motor home that is the subject of the instant litigation, had been declared bankrupt by the time this lawsuit was commenced. Lazy Days had taken possession of this particular motor home as a trade. Lazy Days' usual practice is to perform extensive inspections on vehicles both at the time they are received in trade and prior to delivery on resale to insure that the systems are working properly. *176 This particular motor home apparently underwent two separate pre-delivery inspections and several walk-through inspections prior to sale, which resulted in some reconditioning of the vehicle but did not affect the retractable steps that ultimately caused Mr. Cataldo's injuries.
At the time of sale, Lazy Days provided the Cataldos with a thirty-day limited warranty covering certain specified items and expressly excluding all other items. Additionally, the motor home sale contract specifically excluded various implied warranties, including those of merchantability and fitness for a particular purpose, as well as all other express and implied warranties.
On the night of the accident, which occurred some nineteen months after the Cataldos had purchased the vehicle, Mr. and Mrs. Cataldo were watching television in the motor home in the early evening hours when Mrs. Cataldo's mother sought entrance from the outside. Because it was dark outside, Mr. Cataldo turned on the lights while opening the door. At the same time, he also inadvertently engaged the switch operating the steps to the motor home, which caused the steps to retract, either partially or fully. Later, Mr. Cataldo stepped through the door, expecting that the steps had remained in the extended position. He fell and sustained serious injuries, which led to his death approximately one month later.
Mr. Cataldo's Estate filed a strict liability claim against Lazy Days for an alleged design defect. The complaint alleged that the switch operating the retractable steps was located "along with three (3) other switches inside the motor home near the entrance to the motor home. It was located adjacent to three (3) identical switches which controlled the living room lights, the kitchen lights and the porch lights." The complaint further alleged that Lazy Days had sold the motor home containing a defective and unreasonably dangerous condition that was the cause of Mr. Cataldo's death and the Estate's damages. The dangerous defect was alleged to have originated with Beaver Coaches, Inc., which designed the motor home so that the operating mechanism of the steps did not possess either a visible or audible warning that the steps were not extended when the exterior door to the motor home was opened. Another alleged design defect consisted of the omission of a protective device or mechanism to prohibit the retraction function of the steps from inadvertent engagement.
At the time of Mr. Cataldo's fall, the vehicle was in excess of ten years old; it had been manufactured and designed by a party other than Lazy Days; and the work done on the motor home by Lazy Days was not alleged to be the cause of Mr. Cataldo's injuries.
Upon motion by Lazy Days, the trial court entered a final summary judgment against the Estate, concluding that Florida law does not provide a cause of action in strict liability against a seller of a used product for an alleged design defect. In this appeal, the Estate urges this court to recognize or create such a cause of action or, alternatively, to certify the issue to our supreme court. We decline to do the former; we grant the latter.

Brief History of the Strict Liability Theory
Early in the twentieth century, New York's highest court, the Court of Appeals, characterized the trend of judicial thought on strict liability at that time in the case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916). Buick Motor Co. had manufactured and sold an automobile to a retailer, which, in turn, sold it to Mr. MacPherson. The wooden wheels of the car were manufactured by a different company. Because one of the wheels was *177 made of defective wood, the car suddenly collapsed. Mr. MacPherson was ejected from the vehicle and injured.
Answering the question of whether the defendant owed a duty of care and vigilance to anyone but the immediate purchaser, Justice Cardozo wrote:
If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully. That is as far as we are required to go for the decision of this case. There must be knowledge of a danger, not merely possible, but probable. It is possible to use almost anything in a way that will make it dangerous if defective. That is not enough to charge the manufacturer with a duty independent of his contract.
MacPherson, 217 N.Y. at 389, 111 N.E. 1050.
Analyzing the facts of this case in the context of this operative language from MacPherson, we note at the outset that MacPherson applied to a manufacturer that initially placed a product into the stream of commerce. Here, the parties do not dispute that Lazy Days is not the manufacturer of the product and that it did not introduce the motor home into the marketplace. Instead, the Estate seeks to extend the rule to encompass all those who engage in the economic activity of selling used goods.[1]
Next, we note that in Florida motor vehicles are classified as dangerous instrumentalities. S. Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629 (1920). Because it is a vehicle, the motor home comes within the dangerous instrumentality classification and "is reasonably certain to place life and limb in peril when negligently made." MacPherson, 217 N.Y. at 389, 111 N.E. 1050. However, a motor home functions as both a vehicle and a residence, and in this case the risk of physical injury to the plaintiff arose from its function as a home.
Strict liability in tort arrived in Florida in 1976. In West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla.1976), the Supreme Court of Florida, in a unanimous decision, adopted the doctrine of strict liability as stated by the Restatement (Second) of Torts § 402A. West held that a manufacturer is strictly liable in tort "when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." Id. at 86.
As in MacPherson, the language in West focuses upon the manufacturer, which, "by placing on the market a potentially dangerous product for use and consumption and promotion encouraging the use of these products, thereby undertakes a certain and special responsibility toward the consuming public who may be injured by it." West, 336 So.2d at 86. Furthermore, "[i]n today's world it is often only the manufacturer who can fairly be said to know and understand when an article is suitably designed and safely made for its intended purpose." Id. at 88.

*178 Refusal of Florida's District Courts of Appeal to Extend Strict Liability Doctrine
The argument that strict liability in tort should be extended to the seller of a used product has been considered and rejected by two district courts of appeal. In 1980, the First District declined to extend the doctrine of strict liability to the commercial sale of a used automobile. In Fuquay v. Revels Motors, Inc., 389 So.2d 1238 (Fla. 1st DCA 1980), John Fuquay was killed when his Ford sedan, purchased from Revels Motors, exploded in flames after a rear-end collision. The First District declined to impose strict liability on the seller of the used car, who bears "no responsibility for the placement of the automobile into the stream of commerce. A vendor so removed from the original marketing chain is unable to exert any significant influence on the manufacturer...." Id. at 1240.
Following Fuquay, the Fifth District, in Masker v. Smith, 405 So.2d 432 (Fla. 5th DCA 1981), reviewed the dismissal of a complaint alleging that the seller of a used 1957 automobile was strictly liable for the buyer's injuries. The buyer contended that the seller had created an unreasonable risk of harm by placing the car on the market with a defect in the braking system. The trial court granted a summary final judgment against the buyer. The Fifth District affirmed, finding no basis to extend the West doctrine to the seller of used goods. Noting that in West, 336 So.2d at 90, the supreme court had observed that the doctrine of strict liability does not operate to make the manufacturer or seller an insurer, the court in Masker held: "Imposing liability on the seller of used or second hand goods for latent defects for which he is not responsible and which he could not discover by the exercise of reasonable care would make such dealer a virtual insurer against every kind of defect." 405 So.2d at 434 (citing Fuquay, 389 So.2d at 1238).
A slightly more recent case, also out of the Fifth District, involved a bakery employee who injured her hand upon a slicer. In Keith v. Russell T. Bundy & Assoc., 495 So.2d 1223 (Fla. 5th DCA 1986), Bundy, a dealer of used bakery equipment, sold a roll-slicing machine "as is" to Mrs. Keith's employer. When Mrs. Keith injured her hand, she sued Bundy as the seller of the defective slicer, alleging that Bundy was strictly liable for her injuries because it knew or should have known that the slicer was unreasonably dangerous yet failed to make the machine safe. Reversing the trial court's denial of Bundy's motion for directed verdict on the strict liability count, the court held as follows:
In the instant case, Bundy sold a used slicer "as-is" to Golden Loaf. The alleged defect, the missing interlock, was not on the original slicer manufactured by Alto in 1963, and was not in fact added until some 13 years later. The evidence showed that Bundy was unaware of the changes prior to the accident, and that Alto had never sent it any memorandum regarding the changes in design. The policies underlying the imposition of strict liability are not present here, and Bundy, as a dealer in used goods, should not be held strictly liable for a defect, if any, caused by the manufacturer.
495 So.2d at 1228.
Given that no Florida case has subsequently eroded the holdings in Fuquay, Masker, and Keith, it appears that the principle that a seller of used goods is not strictly liable for a design defect that ultimately injures the purchaser of the product is firmly entrenched in Florida jurisprudence. We agree with this rationale and observe that were we to conclude otherwise, this theory of liability would exist *179 only in this court's geographic jurisdiction but would be barred in other parts of the state.

The Contrary View
No national consensus exists on the refusal to extend strict liability claims to the sellers of used goods. Some states allow the claims in some instances.[2] Particularly instructive, in the Cataldos' view, is the Connecticut case of Stanton v. Carlson Sales, Inc., 45 Conn.Supp. 531, 728 A.2d 534 (1998), which extended strict liability in tort to the seller of a used industrial punch press that severely injured an employee of the company to which it was sold.
The Stanton court thoroughly analyzed the arguments for and against extending strict liability to the seller of a used machine against the backdrop of its own state decisional and statutory law. The court observed that the Connecticut Supreme Court's "recorded decisions have not distinguished the sale of used goods from that of new goods." Id. at 536. Furthermore, the court also noted that Connecticut General Statute section 52-572n(a), which provides for products liability actions, "does not distinguish between sellers of new and used products," but the legislature could have done so if it desired.[3]Id. at 537. Finally, the Stanton court observed that the section 402A of the Restatement (Second) of Torts, which it described as "the foundation stone of Connecticut products liability law," imposes strict liability on one who sells any unreasonably dangerous product in a defective condition without distinguishing between sellers of new or used goods. Id. at 539. Particularly noteworthy is comment (c) of section 402A:
On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.
2 Restatement (Second) of Torts, § 402(A), comment (c), quoted in Stanton, 728 A.2d at 541-42.
Thus, ultimately, the reasons for extending liability to the sellers of used products is economic: the seller "is in the best position to distribute the costs of the risk created by the defective product it has sold." Id. at 540 (quoting Nelson v. Nelson Hardware, Inc., 160 Wis.2d 689, 467 N.W.2d 518, 524 n. 6 (1991)). The seller can pass along the added costs by raising the price of the product, and the increased price can also help the seller absorb the cost of liability insurance should it choose to purchase it.
In addition to economic considerations, public policy reasons for imposing strict *180 liability on the sellers of used goods are grounded in the concept of fairness. Here, the Stanton court makes a distinction that is relevant to this case. In Stanton the injured party was a worker at a manufacturing concern; the worker himself had no role in the economic transactions leading to the company's purchase of the press he operated. For the "bystander victim of a defective product, the doctrine of caveat emptor makes no sense whatsoever." Stanton, 728 A.2d at 543. Such bystander victims are in "precisely the same position as persons injured by defective new products." Id. In such situations, "to use Justice Cardozo's famous words, `to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser,' those responsible for putting a dangerous product on the market have a special responsibility imposed by law." Id. at 543 (quoting MacPherson, 217 N.Y. at 389, 111 N.E. 1050).
In this case, however, the Cataldos were not bystander victims but were direct purchasers of the motor home. Unlike the purchaser of a new motor home, who can realistically assume that the vehicle has no design flaws and will operate safely and properly, the Cataldos' expectations were limited. For the Cataldos, "the ancient doctrine of caveat emptor makes at least some intuitive sense." Id. at 542.

Certified Question
The rationale for imposing strict liability on the sellers of used products is well explicated by the Stanton court. This court, however, is guided by the decisions of the First and Fifth District Courts of Appeal, whose rationale we adopt. Therefore, we decline to overturn the trial court's summary judgment against the Cataldos on its strict liability claim and hold that a Florida court cannot recognize a cause of action in strict liability by the purchaser of a used motor home against the seller. We do, however, certify the following question to the Florida Supreme Court as one of great public importance:
CAN A FLORIDA COURT IMPOSE STRICT LIABILITY ON THE SELLER OF A USED AND RECONDITIONED MOTOR VEHICLE THAT IS DEFECTIVELY DESIGNED AND UNREASONABLY DANGEROUS?
We answer the question in the negative and affirm the decision on appeal in all respects.
SALCINES and STRINGER, JJ., concur.
NOTES
[1] We observe that, because of economic forces in the marketplace, many sellers of used vehicles will advertise and offer limited warranties, so a consumer has a choice to negotiate for such a warranty.
[2] See Tracey A. Bateman, Annotation, Products Liability: Application of Strict Liability Doctrine to Seller of Used Product, 9 A.L.R. 5th 1 (2005).
[3] Because it is of only marginal relevance here, this opinion omits any discussion of the Stanton court's extensive analysis of the policies and history of the Connecticut products liability statute.